**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PABLO CALDERON,<br><br>    Plaintiff,<br><br>  v.<br><br>U.S. DEPARTMENT OF AGRICULTURE,<br>FOREIGN AGRICULTURAL SERVICE,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 14-cv-0425 (TSC) |

## <u>MEMORANDUM OPINION</u>

Before the court are cross-motions for summary judgment in this case brought under the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  In response to a 2013 FOIA request by

Plaintiff Pablo Calderon for transactional documents relating to the GSM-102 Export Credit

Guarantee Program, Defendant U.S. Department of Agriculture ("USDA") Foreign Agricultural

Service ("FAS") produced over 9,000 pages of responsive documents.  The documents contained

significant redactions, which FAS stated were necessary under FOIA Exemptions 4 and 6.  These

exemptions cover confidential commercial information and personal information, respectively.

The parties now cross-move for summary judgment as to the application of those exemptions.

Upon consideration of the parties' filings and the arguments of counsel at the hearing

held on December 14, 2016, the court concludes that Exemptions 4 and 6 apply to some, but not

all, of the redacted information.  Therefore, as more fully explained below, FAS's Motion is

GRANTED IN PART and DENIED IN PART, and Plaintiff's cross-motion is also GRANTED

IN PART and DENIED IN PART.

1

I.      **BACKGROUND**

A.      **USDA-FAS's GSM-102 Program**

This suit involves a FOIA request for certain financial documents submitted to FAS

under the agency's Export Credit Guarantee Program ("GSM-102" or the "Program").  As

described by the USDA in FAS's briefs, submitted declarations, and Statement of Material Facts,

the Program, which is administered by FAS on behalf of the Commodity Credit Corporation

("CCC"), supports the financing of American agricultural commodity exports by guaranteeing

the payments owed to U.S. exporters in qualifying transactions made with foreign importers.  *See*

7 C.F.R. § 1493.10(a).  Within the GSM-102 Program, agricultural exporters in the U.S.

negotiate sales with an importer in an eligible foreign destination that receives financing from a

foreign financial institution qualified under the Program.  (Second Klusaritz Decl. ¶¶ 25–26

(ECF No. 37-3)).  Exporters seek payment guarantees under the Program because the CCC will

"pay the Exporter, or the U.S. Financial Institution that may take assignment of the Payment

Guarantee, specified amounts of principal and interest in case of default by the Foreign Financial

Institution that issued the Letter of Credit for the export sale covered by the Payment Guarantee."

7 C.F.R. § 1493.10(a); *see also* 7 C.F.R. § 1493.100 (terms and requirements of payment

guarantee).[1]

To attain a payment guarantee from the CCC, the parties to the transaction must present

several key documents.  There must be a letter of credit from the foreign financial institution to

the importer.  7 C.F.R. § 1493.90(a)(1).  The letter of credit must stipulate that the foreign

financial institution received "at least one original clean on board bill of lading as a required

---

[1]  Exporters, U.S. financial institutions, and foreign financial institutions must all be approved by
the CCC.  *See* 7 C.F.R. §§ 1493.30 (exporters), 1493.40 (U.S. banks), 1493.50 (foreign banks).

document," unless the exporter is "named as the shipper on the clean on board bill of lading," in which case the letter of credit "may stipulate a copy or photocopy of an original clean on board bill of lading." 7 C.F.R. § 1493.90(a)(1)(i)(A). There must also be a "Firm Export Sales Contract" for an Eligible Export Sale before an exporter can submit an application to the CCC for the payment guarantee. 7 C.F.R. § 1493.70(a). The application for the payment guarantee must include information such as the name and address of the importer, or the "[n]ame and address of the party on whose request the Letter of Credit is issued, if other than the importer," the date of sale, a description of the agricultural commodity, the mean quantity, the unit sales price, and various other details. *Id.*

After securing a payment guarantee, and within 30 days after exporting the commodity, an exporter must also provide the CCC with an "evidence of export report" which includes the date of export, the exported value, the quantity, a description of the commodity, the unit sales price, and various other information. 7 C.F.R. § 1493.130(a), (b). An exporter may assign the payment guarantee to a U.S. financial institution, and if it does so, it must submit a notice of assignment to the CCC that meets certain requirements. 7 C.F.R. § 1493.120. Lastly, the exporter must obtain and maintain proof that the exported goods entered the country shown on the payment guarantee. 7 C.F.R. § 1493.150. Certain export contracts are not eligible for payment guarantees under the Program, including if the date of export pre-dates the date of the application for the payment guarantee; if the actual date of export is later than the final date to export shown on the payment guarantee; or if the letter of credit from the foreign financial institution is dated more than thirty days after the date of export. 7 C.F.R. § 1493.100(f).

Thus, the Program involves four primary actors: the exporter, the U.S. financial institution, the foreign financial institution, and the importer. The exporter and importer contract

3

for the sale of agricultural commodities, followed by the importer securing a letter of credit from the foreign financial institution to enable it to pay for the import.  The exporter applies for and secures a payment guarantee, then typically assigns the guarantee to a U.S. financial institution. The U.S. bank typically pays the exporter for the sale in exchange for the assignment, and as a result extends a *de facto* loan to the foreign financial institution, which now owes the debt to the U.S. bank.  (*See* Second Klusaritz Decl. ¶¶ 28–29).  These transactions may become far more complicated, however, if ownership of the commodity is transferred several times throughout the export process, meaning the exporter may be different from the shipper, and the importer may be different from the consignee or from another intervening purchaser.

Plaintiff tells a completely different story, however.  According to him, the transactions underlying the specific documents he requested—and indeed most of the guaranteed transactions in the whole Program—do not actually involve the export of physical agricultural commodities, but rather are just "structured trade finance" transactions.  In these transactions, exporters or other commodity traders will "recycle" the shipping documents from prior actual exports, meaning that a current financial transaction is supported only by photocopies of a previous actual export.  (Pl. Statement of Material Facts ("PSMF") ¶¶ 16–24 (ECF No. 39-3)).  The foreign importer receives a "synthetic" letter of credit from the foreign bank, and the U.S. exporter presents the U.S. bank with a photocopy of an old bill of lading, along with a newly-negotiated commercial invoice between the exporter and importer.  (*Id.*).  Plaintiff notes that in many instances the exporter and importer that appear on the commercial invoices supporting these synthetic trades are just related entities or subsidiaries.  (*Id.* ¶ 20).  Once the transaction is approved and a program guarantee is attached, the U.S. bank provides the exporter with the amount of money that appeared in the commercial invoice.  That exporter then forwards those

funds to the foreign bank.  (*Id.* ¶ 21).[2]

In effect, under the Program as Calderon describes it, U.S. banks are knowingly extending no-strings-attached loans to foreign banks in order to provide those banks with liquid capital, and this financing carries a low interest rate because the CCC guarantees the debt under the GSM-102 Program.  (*Id.*).  In exchange for facilitating this transaction, the foreign bank pays the U.S. exporter a fee, which provides the exporters or commodity trading entities with their revenue.  (*Id.*).  Plaintiff also describes transactions called "renting trade flows," in which agricultural exporters allow others to "rent," *i.e.* photocopy, their old bills of lading and other documents in exchange for a "rental fee."  (*Id.* ¶ 27).  The ability to rent others' bills of lading, rather than needing to recycle one's own, has expanded the number of commodity traders that can participate as "exporters" in these transactions under the Program.  (*Id.* ¶¶ 27–29).

According to Plaintiff, synthetic letters of credit bear certain hallmarks that indicate that they are used in structured trade finance transactions.  These are:

> (1) language in the LC indicating that "presentation of documents would be acceptable despite 'any and all discrepancies'" and that "documents shall be acceptable as presented," as opposed to requiring "complying presentations of documents;" [sic] (2) permitting photocopies of bills of lading and not requiring the originals, which are the Consignee's title to the shipped goods and typically are the underlying security in the LC; and (3) the LC was issued after the BLs and after the goods were loaded on board the vessels transporting the goods.

(Pl. Rep. at 9 (citing *Fortis Bank (Nederland) N.V. v. Abu Dhabi Islamic Bank*, 936 N.Y.S. 2d

---

[2]  As will be discussed later in this Opinion, Calderon relies exclusively on his own declaration and the declaration of Brett Lillemoe, his co-defendant in his criminal case.  Though FAS has raised no such objection, the court is not convinced that Calderon and Lillemoe have personal knowledge of how the market operates generally and how the objecting submitters' transactions were structured specifically, as required for affidavits.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

58, 2010 N.Y. Misc. LEXIS 6658, at *11–12 (N.Y. Sup. Ct. August 25, 2010))).  Calderon also

requests that the court conduct an *in camera* review of the transaction documents, which he

asserts would confirm that the transactions are synthetic, because "the BL parties (Actual

Exporter and Consignee) are different from the LC and commercial invoice parties (GSM

Exporter, GSM Importer and Intervening Purchaser)."  (Pl. Mem. at 16).

Defendant FAS does not outright dispute the existence of synthetic transactions in the

Program, but instead argues against the need for *in camera* review on the grounds that "FAS

personnel who work daily with the GSM-102 program cannot determine by the face of the

responsive records (redacted or unredacted) whether the underlying structure of the transactions

were 'synthetic transactions' that used 'rental trade flows.'"  (Third Klusaritz Decl. ¶ 9 (ECF No.

47-2)).  FAS further states that, despite Calderon's characterization, "acceptable" Program

transactions can be complex and can involve numerous parties, with arrangements such that

parties X and Y may appear on a bill of lading as the shipper and consignee, while parties A and

B appear on the guarantee application and commercial invoices as the exporter and importer.

(*See id.* ¶¶ 9–11).  This directly contradicts Calderon's assertion that only synthetic transactions

would have different parties on the bill of lading and the guarantee application or commercial

invoice.

Moreover, FAS notes that a letter of credit dated after a bill of lading is not indicative of

a synthetic transaction, since this is explicitly allowed under the Program regulations.  (*Id.* ¶ 17

(citing 7 C.F.R. § 1493.100(g)(3))).  Finally, FAS concludes by saying, in essence, "so what?"—

arguing that even if the transactions were synthetic, the submitters still engaged in competitive

transactions and would face the same harms upon disclosure of the redacted information,

meaning that any focus on the synthetic nature of transactions is misplaced or irrelevant in this

court's Exemption 4 analysis. (*See id.* ¶ 15).

Calderon's knowledge of the Program and any synthetic trading occurring within it come from his years operating Southern Cross Advisors LLC, which in FY 2009 and FY 2010 participated in the Program. (Calderon Decl. ¶ 1). Since 2010, he has not participated in the Program. (*Id.* ¶ 44). In May 2015, FAS suspended him from participating in any federal government program, including the GSM-102 Program. (*Id.*). In connection with his participation in the GSM-102 Program and engaging in synthetic trading, Calderon was indicted by a grand jury on February 20, 2015 in the U.S. District Court for the District of Connecticut on twenty-three counts of wire fraud, bank fraud, false statements, money laundering, and conspiracy to commit wire fraud and bank fraud, along with co-defendants Brett Lillemoe and Sarah Zirbes. *See* Indictment, ECF No. 1 (Feb. 20, 2015) (Case No. 3:15-cr-00025-JCH). He pleaded not guilty on all counts. (Calderon Decl. ¶ 44). After a five-week jury trial, Calderon was convicted on November 9, 2016 of one count of conspiracy and one count of wire fraud. *See* Jury Verdict Form, ECF No. 324 (Nov. 9, 2016) (Case No. 3:15-cr-00025-JCH). He is scheduled to be sentenced on March 24, 2017. *See* Order (ECF No. 356) (Feb. 1, 2017) (Case No. 3:15-cr-00025-JCH).

### B.     Calderon's FOIA Request and the Present Litigation

On July 17, 2013, Calderon submitted a FOIA request to FAS seeking specific financial documents that had been submitted to FAS under the GSM-102 Program. (Ex. 1 to Calderon Decl. (ECF No. 39-5 at 16–17)). Specifically, Calderon requested:

- All records related to claims for loss of guarantees covering the defaults of banks in Ukraine, Kazakhstan, and Russia.
- All records related to the guarantees described in the previous bullet point, including but not limited to guarantee applications with amendments, related sales contracts, the guarantees, amended guarantees, evidence of export reports, and assignment notifications.

- All records of annual compliance reviews of all program exporters related to guarantees covering banks in any country in the Eurasia Region or in Russia from FY 2002 to FY 2012.
- All records related to the guarantees described in the previous bullet point, including but not limited to guarantee applications with amendments, related sales contracts, the guarantees, amended guarantees, evidence of export reports, and assignment notifications.

(*Id.*).  Approximately eight months later, after receiving no documents from FAS, Calderon filed this litigation on March 18, 2014.  (ECF No. 1).

   In April 2014, FAS identified approximately 9,000 responsive documents.  (*See* Second Klusaritz Decl. ¶ 12).  After determining that some of these records might contain confidential commercial information ("CCI"), as required by Executive Order 12,600, FAS requested input from six companies and six banks that had submitted the on whether the records contained CCI.  (*Id.* ¶¶ 12–14).  FAS received responses from five of the exporters and all six of the banks.  (*Id.* ¶¶ 15–16).  Of the exporters, Bunge, Cargill, GDC Trading, and GSTS objected to disclosure, Agritrade did not respond, and Grove Services responded that it had no objection.  (*Id.*).  Of the banks, Deutsche Bank and Bank of New York objected on behalf of their clients, and Union Bank of California, Rabobank Nederland, UniCredit Bank, and Cobank did not object.  (*Id.*).

   In October 2014 and January 2015, FAS produced 9,212 pages of responsive documents in three batches to Calderon.  (*Id.* ¶¶ 17–22, 32).  FAS organized these responsive records into three categories: registration files, claim files, and compliance files.  The registration files contain "applications for GSM payment guarantees; amendments to GSM payment guarantees; email correspondence relating to those applications; CCC Export Credit Guarantee Program Payment Guarantee Forms ('Form CCC-627s'); evidence of export reports; internal GSM System delivery summary reports; requests for payment guarantee amendments; and notices of default (if applicable)."  (*Id.* ¶ 33).  The claim files contain "CCC payment vouchers, claims

calculation worksheets, claims checklists; instrument of subrogation and assignment; claim for

loss letters; evidence of export reports; copies of payment schedules; invoices; bills of lading;

letters of credit and related SWIFT messages; financing agreements; and CCC Export Credit

Guarantee Program Payment Guarantee Forms ('Form CCC-627s')."  (*Id.* ¶ 34).  Finally, the

compliance files category includes "validation review checklists, applications for credit

guarantees; CCC Export Credit Guarantee Program Payment Guarantee Forms ("Form CCC-

627s"); amendments to GSM payment guarantees; evidence of export reports; letters of credit;

veterinary certificates; funds transfer documents; contracts with buyers; invoices; bills of lading;

certificates of entry; and correspondence."  (*Id.* ¶ 35).

    Before releasing the responsive documents, FAS made significant redactions.  These

included "the names, signatures and contact information (including addresses, telephone

numbers, and email addresses) of employees of exporters, bank officials, and other private

individuals with whom the exporters conducted transactional business."  (*Id.* ¶ 45).  FAS asserts

that these redactions were proper under FOIA Exemption 6.  FAS additionally made extensive

redactions under FOIA Exemption 4 of "unit pricing data, quantity data which, in conjunction

with guarantee value, would allow competitors to ascertain unit price information, certain

contractual terms, and identities of partners of these companies in their trade transactions

(including foreign banks, buyers, shippers, consignees, notify parties, letter of credit parties,

forwarders, and intervening purchasers)."  (*Id.* ¶ 57).  The Second Klusaritz Declaration lists the

types of redacted information, and justifications for each of those redactions, for eight types of

registration files (*id.* ¶ 61(a)–(h)), eleven types of claims files (*id.* ¶ 62(a)–(k)), and thirteen types

of compliance files (*id.* ¶ 63(a)–(m)).

    In June 2015, both parties filed cross motions for summary judgment as to the

appropriateness of these redactions.  (ECF Nos. 23, 24).  In August 2015, after the court

determined that Calderon's reply brief (ECF No. 32) failed to comply with Local Civil Rule 7(h),

the court found it in the interest of justice to order new summary judgment briefing.  FAS

subsequently filed its motion in September 2015 (ECF No. 37), and Plaintiff filed his cross-

motion in October 2015 (ECF No. 39).  In May 2016, the court additionally required FAS to file

a brief notice responding to certain arguments raised by Calderon in his reply brief, and FAS did

so in June 2016.  The court held oral argument on December 14, 2016.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the record shows there is no genuine issue of

material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. District of Columbia*, 298

F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists,

the court must view all facts in the light most favorable to the non-moving party.  *See Adickes v.

S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is material if "a dispute over it might affect

the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary'

do not affect the summary judgment determination."  *Holcomb v. Powell*, 433 F.3d 889, 895

(D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  An issue is

genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.* (quoting *Anderson*, 477 U.S. at 248).  The party seeking summary judgment "bears

the heavy burden of establishing that the merits of his case are so clear that expedited action is

justified."  *Taxpayers Watchdog, Inc., v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).

FOIA cases are typically and appropriately decided on motions for summary judgment.

*Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).  Agencies bear the

burden of justifying withholding of any records, as FOIA requires the "strong presumption in favor of disclosure." *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). The court therefore analyzes all underlying facts and inferences in the light most favorable to the FOIA requester, even where the requester has moved for summary judgment. *See Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999).

In cases such as this, which concern the applicability of certain FOIA exemptions, agencies may rely on supporting declarations that are reasonably detailed and non-conclusory. *See, e.g.*, *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011); *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 838 (D.C. Cir. 2001). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU*, 628 F.3d at 619. "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (internal quotation marks omitted) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). However, a motion for summary judgment should be granted in favor of the FOIA requester where "an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *Coldiron v. U.S. Dep't of Justice*, 310 F. Supp. 2d 44, 48 (D.D.C. 2004) (quoting *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992)).

## III.   DISCUSSION

### A.   Compliance with Local Civil Rule 7(h)

Before reaching the merits of FAS's redactions, Calderon first argues that FAS failed to

comply with Local Civil Rule 7(h) in several ways, including failing to provide a concise statement of material facts and an adequate *Vaughn* index.

      1.  <u>Statement of Material Facts</u>

Calderon asserts that FAS's motion for summary judgment should be denied outright because the Statement of Material Facts it submitted with its Motion omitted several facts on which FAS must have relied, violating Local Civil Rule 7(h)(1) and depriving him of the ability "to show that he has controverted this purported fact."  (Pl. Opp. at 20).  The local rule states that "[e]ach motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement."  Local Civ. R. 7(h)(1).  Plaintiff points specifically to this court's August 14, 2015 Minute Order, which reminded the parties "to comply fully" with the local rule.  (Pl. Opp. at 19).[3]

Plaintiff notes, for example, that FAS should have included as a factual statement that the release of information would allow competitors to copy the transaction structure.  (*Id.*).  FAS counters that it complied fully with the rule since it submitted a Statement of Material Facts as to which it believed there was no genuine dispute as required, there is no obligation to include legal arguments in the statement of material facts, and moreover, agencies are frequently permitted to rely on agency affidavits alone in FOIA cases.  (Def. Rep. at 4).

In the court's view, FAS's submitted Statement of Material Facts is sufficient to comply with its obligations under Local Rule 7(h)(1).  Calderon was not prejudiced by any non-compliance, as he had a full opportunity to submit his own Statement of Material Facts in

---

[3]  Noticeably absent from Calderon's brief, however, is the fact that the court's August 14, 2015 Order was a reprimand to Calderon himself, not FAS, for failure to comply with Local Rule 7(h), resulting in the court striking all filed summary judgment motions and ordering re-briefing.

support of his cross-motion, to submit supporting declarations, and to otherwise address any factual issues he found with FAS's submissions.  The court therefore will not deny FAS's motion on this ground.

Calderon further argues that FAS violated Local Civil Rule 7(h) by failing to submit a "separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated" with its combined Opposition and Reply brief.  Once again, the court concludes that any perceived non-compliance with the local rules resulted in no prejudice to Calderon, who had a full and fair opportunity to raise all factual and legal disputes in his own briefs, statements, and declarations.  Therefore, the court declines to deny FAS's motion on this ground as well.

### 2. *Vaughn* Index

Calderon argues that FAS's *Vaughn* index is insufficient because it does not include an explanation of the bases for any of its redactions in the responsive documents, beyond stating which exemption it invoked, and that this deficiency is grounds to deny FAS's motion for summary judgment.  (Pl. Opp. at 22).

The *Vaughn* index should be "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply."  *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977).  In judging the sufficiency of a *Vaughn* index, "it is the function, not the form, of the index that is important."  *Keys v. DOJ*, 830 F.2d 337, 349 (D.C. Cir. 1987).  Here, FAS's *Vaughn* index includes columns for Bates numbering, document description, document date, applicable FOIA exemption, and specific information redacted or withheld.  (*See* ECF No. 27-4).  While the index itself does not include legal

justifications for applying the exemptions, the accompanying agency and submitter affidavits are sufficiently descriptive for the court and for Calderon to understand the agency's reasoning for each redaction.  Given the large number of documents at issue, and that the categories of information are frequently repeated in the various documents, FAS's decision to refrain from repetitive and redundant explanations in its *Vaughn* index in favor of explaining in its submitted declarations is satisfactory to the court.  Therefore, the court rejects Calderon's request to deny FAS's motion on this ground.

**B**.     **FOIA Exemption 4:  Confidential Commercial Information**

1.   Applicable Legal Standard

FAS invokes FOIA Exemption 4, codified at 5 U.S.C. § 552(b)(4), to support the majority of its extensive redactions.  (*See* Second Klusaritz Decl. ¶¶ 57, 61–63).  Under this exemption, an agency need not disclose (1) trade secrets or (2) commercial or financial information that is obtained from a person and is privileged or confidential.  5 U.S.C. § 552(b)(4).  The purpose of this exemption is to "balance the strong public interest in favor of disclosure against the right of private businesses to protect sensitive information." *Nat'l Parks & Conservation Ass'n v. Morton* (*Nat'l Parks I*), 498 F.2d 765, 768–69 (D.C. Cir. 1974).  FAS does not argue that the redacted information contains trade secrets or is privileged (Def. Mem. at 11, 14 n.2), and Calderon does not dispute that the information is commercial and was obtained from a person (Opp. at 24).  Therefore, the only disputed issue is whether the redacted information is "confidential."

Courts use different approaches to analyze whether information is confidential depending on whether that information was voluntarily or involuntarily submitted.  Under Exemption 4, information that the government requires is "less rigorously protected" than information that is

voluntarily submitted.  *Biles v. HHS*, 931 F. Supp. 2d 211, 219 (D.D.C. 2013) (citing *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878–80 (D.C. Cir. 1992) (en banc)).  The parties agree that in order to participate in the Program, the exporters were required to provide the responsive documents and information as part of their program guarantee application.  When information is required to be submitted to the government, it is considered confidential under FOIA if "disclosure is likely . . . (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained."  *Nat'l Parks I*, 498 F.2d at 770.  FAS argues that its application of Exemption 4 is appropriate under either prong.

2.  <u>Whether Disclosure Is Likely to Impair FAS's Ability to Obtain Information</u>

FAS argues that disclosure of the redacted information would likely harm its ability to obtain this information because fewer exporters would submit guarantee applications to participate in the GSM-102 Program.  (Second Klusaritz Decl. ¶ 52).  One of the objecting submitters, Bunge, stated that it "would be forced to withdraw from participating in the GSM-102 Program."  (Brotherton Decl. ¶ 14).  Another submitter, GDC Trading, also stated that it "will avoid such transactions" if the information is disclosed.  (Del Canto Decl. ¶ 11).  While that may be true, the court is not convinced that whether private entities will *participate* in the GSM-102 Program is relevant to the court's analysis under FOIA of whether FAS will likely be impaired in its ability to obtain information in the future from those entities that *do* participate.  When entities apply to FAS to take advantage of the Program's significant economic incentives, they will be obligated to provide the required transactional documents, and FAS has not asserted that the quality or substance of the information provided in these required documents might be diminished.  The court therefore concludes that disclosure of the redacted information is not

likely to impair FAS's ability to collect this information in the future.

### 3.   Whether Disclosure Is Likely to Cause Substantial Competitive Harm

Under the competitive injury prong, FAS must establish that "the submitters '(1) actually face competition, and (2) substantial competitive injury would likely result from disclosure.'" *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999) (quoting *Nat'l Parks & Conservation Ass'n v. Kleppe* (*Nat'l Parks II*), 547 F.2d 673, 679 (D.C. Cir. 1976)).   The competitive injury must "be limited to harm flowing from the affirmative use of the proprietary information *by competitors*." *Pub. Citizen Health Res. Grp. v. FDA*, 704 F.2d 1280, 1291 n.30 (D.C. Cir. 1983) (emphasis in original).   Moreover, a "sophisticated economic analysis of the likely effects of disclosure" is not required. *Id.* at 1291 (citing *Nat'l Parks II*, 547 F.2d at 681).   Nor must the agency "prove that substantial harm is 'certain' to result from disclosure, but only that such harm is 'likely.'" *Boeing v. U.S. Dep't of Air Force*, 616 F. Supp. 2d 40, 45 (D.D.C. 2009) (citing *McDonnell Douglas Corp. v. U.S. Dep't of Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 1979)).   Further, the agency need only proffer evidence supporting the existence of potential competitive injury or economic harm. *Essex Electro Engineers, Inc. v. Sec'y of Army*, 686 F. Supp. 2d 91, 94 (D.D.C. 2010) (citing *Gulf & W. Indus., Inc. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979)).   Evidence of *actual* harm need not be demonstrated. *Id.*   However, the agency may not simply offer the court "conclusory and generalized allegations" of substantial competitive harm to support its redactions. *Nat'l Parks II*, 547 F.2d at 681.   Instead, it must provide "specific factual or evidentiary material to support [its] claim that harm is likely to result." *Boeing*, 616 F. Supp. 2d at 45 (citing *Nat'l Parks II*, 547 F.2d at 679).

### a.   *FAS Has Demonstrated There Is Actual Competition*

FAS must first demonstrate that actual competition exists in this market.   Although both

parties gloss over this analysis, and neither address it in their briefs, the court finds that evidence

for market competition is established in the record.  (*See* Brotherton Decl. ¶¶ 8–10 (discussing

competitors in the market, low profit margins, and barriers to entry that prevent other

competitors from entering the market); Lillemoe Decl. ¶¶ 26–29 (discussing how he "beat

Cargill and Bunge on price" and "compete[d] in the Programs of Russia and Eurasia")).

> b.  *There Remain Genuine Disputes of Material Facts as to Whether*
> *Disclosure Would Likely Cause Substantial Competitive Harm*

FAS must also show that disclosure of the redacted information would likely cause

substantial competitive injury to the objecting submitters.  Moreover, where, as here, there are

different types of information that FAS asserts must be withheld, then "the agency has the

burden of establishing why or how *each category* of [information] is likely to cause substantial

competitive harm."  *Biles*, 931 F. Supp. 2d at 227 (emphasis added) (citing *S. Alliance for Clean*

*Energy v. U.S. Dep't of Energy*, 853 F. Supp. 2d 60, 73–75 (D.D.C. 2012)).

> (i).  <u>FAS's Submissions on Harms</u>

In support of its assertion that the submitters here would likely face substantial

competitive harm, FAS submitted an affidavit from Sally A. Klusaritz (the "Second Klusaritz

Declaration"), who oversees FOIA production at FAS, as well as declarations from three of the

four exporters that objected to the disclosure: George Del Canto of GDC Trading, LLC; Karla L.

Hennessy of Cargill, Inc.; Simon Brotheron of Bunge SA; and Chris Nikkel of Bunge North

America.  FAS also provided an unsworn letter from an unidentified "authorized signer" at

GSTS L.P., the fourth objecting submitter.  As summarized by the Second Klusaritz Declaration,

the objecting exporters "invest considerable resources to develop relationships with buyers,

agents, suppliers, foreign banks, and other entities involved in these complicated international

trade transactions," and disclosure "would give a knowledgeable competitor the fruits of years of

developed expertise." (Second Klusaritz Decl. ¶¶ 55–56). FAS argues that for nearly all of the different categories of information in the various types of documents, disclosure would enable competitors to enter the market, reach out to potential importers and banks, and undercut the prices offered by the objecting exporters, thereby causing competitive harm from losing out on potential future transactions. (*Id.* ¶ 59). FAS also argues that disclosing the names of company officials and employees "would allow competitors to contact them with more enticing employment offers" or to ask about their business practices (*id.* ¶ 61(b)), and disclosing bank account information "would subject the affected exporters to harm by competitors, which would have information about and access to the exporters' assets" (*id.* ¶ 62(e)).

For their part, the objecting exporters' declarations paint with a similarly broad and conclusory brush. Chris Nikkel, from Bunge North America, describes the substantial competitive harm that Bunge would suffer if competitors were to "gain valuable insight," "have insight," gain "significant insight," "learn," "ascertain the market activity and market share," gain "insights into Bunge's capacity," and "gain a tremendous advantage into 'solving the puzzle' of a successful competitive strategy in these GSM-102 transactions." (Nikkel Decl. ¶¶ 7, 10, 12). The most specific harm Nikkel offers is that "disclosure of the importer names would enable Bunge's competitors to poach Bunge's customers without having to invest the time and resources to develop those customers itself." (*Id.* ¶ 8).

Simon Brotherton, from Bunge SA, states that Bunge would face substantial competitive harm from disclosure because the redacted information would "give[] extensive insight," "provide competitors with valuable information," "enable competitors to enter transactions without incurring the time and costs," "enable Bunge's competitors to obtain, overnight, the financing element," give "invaluable information regarding where Bunge has determined

opportunities exist," "enable competitors to ascertain the identity of the foreign bank involved in the transaction," "gain a significant insight," "ascertain Bunge's volume discounting strategy," and "assess Bunge's capacity to deliver."  (Brotherton Decl. ¶¶ 15, 16, 17, 19, 20, 22). Moreover, he asserts that disclosure of the names of Bunge employees would give competitors "the ability to raid and hire away Bunge's personnel"; disclosure of bank account information "could result in efforts to fraudulently withdraw funds from accounts"; and, more generally, that this information would enable competitors to "undermine and undercut Bunge's contracts." (*Id.* ¶¶ 18, 21, 20).

Karla Hennessy of Cargill mostly discusses how the program operates, and offers as a specific example of substantial competitive harm that disclosure "would allow [competitors] to unfairly compete for the registration of [its] trade flows."  (Hennessy Decl. ¶ 16).

Finally, George Del Canto, of GDC Trading, LLC, states that disclosure "would allow competitors to piece together information," "would [put competitors] in a position to seriously jeopardize GDC Trading's business," "could [allow competitors to] use that information to disrupt the flow of business and transactions," "would allow such competitors to improperly gain a strategic advantage," "would result in a chilling effect on a party's willingness and interest in participating in programs such as the GSM-102 program," would result in "immediate loss of substantial amounts of business," "will undoubtedly cause some of [GDC Trading's] trading partners to immediately cease doing business with GDC Trading," and would allow competitors "to unfairly undercut GDC Trading."  (Del Canto Decl. ¶¶ 5, 6, 7, 9).  Further, disclosure of this information would result in GDC Trading's inability "to continue to operate and conduct business as it has done for many years."  (*Id.* ¶ 13).

In sum, FAS argues that the general disclosure of the names and addresses of the

transactional parties, including foreign banks, shippers, importers, consignees, buyers, etc., as well as the numerical information on pricing, units, weights, and amounts, would (1) provide potential competitors in the market for GSM-102 Program transaction with unfair insight, and (2) enable those competitors to use that insight to target banks and other parties with better offers on price and other terms, resulting in lost future transactions for the submitters.

As an initial matter, the court notes that FAS's submissions work to weaken its own argument. Sally Klusaritz first states that the "underlying export transactions are based on commercial relationships established between buyers and sellers that endure beyond a specific transaction." (Second Klusaritz Decl. ¶ 55). One of the Bunge submitters further explains that exporters in the Program must "cultivate and maintain client relationships with foreign banks," "have the financial gravitas to move assets quickly and to hold relationships around the world," "have the capability to bring in a U.S. bank as part of the structured finance transaction," and "have the experience and expertise with the GSM-102 program to successfully operate." (Brotherton Decl. ¶ 10). Bunge further states that there are "high barriers to entry" in this market. (*Id.*). FAS offers little explanation for how a new competitor, armed only with the disclosed names of importers, banks, and other pricing/quantity info, would overcome these "high barriers to entry" built into structuring these program transactions. Nor does FAS or the submitters state that they, as existing market competitors, would use the disclosed information in competition with each other. Therefore it is unclear to the court what entities would or could even make use of any of the redacted information here.

### (ii).   Calderon's Counter-Arguments on Harms

Unsurprisingly, Calderon asserted facts and arguments to counter those asserted by FAS regarding the submitters' substantive competitive harm. Yet FAS failed to dispute the vast

majority of Calderon's factual assertions in its Response to Plaintiff's Statement of Material

Facts, instead dismissing them as "not material." (*See* Def. Resp. to PSMF ¶¶ 1, 5–37, 39–53,

55–105 (ECF No. 47-1)). Calderon thus requests that the court therefore deem all his facts as

admitted. However, the court declines to find that all of Plaintiff's facts are admitted, given that

they are supported only by the declarations of Calderon himself and Brett Lillemoe.

First, Calderon argues that there can be no competitive harm from the disclosure of the

particular transactional information contained in the redacted records because those transactions

cannot be replicated. Calderon's FOIA request was limited to transactions involving exports to

Russia, Ukraine, and Kazakhstan. He states that the banks in Russia, Kazakhstan, and Ukraine

are either defunct or no longer qualify, and these countries are either no longer part of the GSM-

102 Program or have not been used for exports in several years. (*See* PSMF ¶ 9). A review of

FAS's yearly Program reports confirms Calderon's assertion: in FY 2017, the credit allocation

for the Caucasus/Central Asia Region does not include Russia or Ukraine, only Kazakhstan,[4] but

there are no approved foreign financial institutions in Kazakhstan (nor in Russia or Ukraine).[5]

Moreover, there were no program guarantees for exports to these three countries in FY 2016 or

FY 2015.[6] In FY 2014, there were no program guarantees in Kazakhstan or Ukraine, only

Russia—but halfway through the year, in July 2014, Russia was suspended from the Program as

---

[4] https://www.fas.usda.gov/programs/export-credit-guarantee-program-gsm-102/gsm-102-
allocations.

[5] https://www.fas.usda.gov/programs/export-credit-gurantee-program-gsm-102/gsm-102-
approved-financial-institutions-central-asia.

[6] https://www.fas.usda.gov/sites/default/files/2016-10/2016_5.pdf (FY 2016);
https://www.fas.usda.gov/sites/default/files/2015-10/fy_2015_-_final_0.pdf (FY 2015).

part of U.S. sanctions.[7]  FAS admits that Russia and Ukraine no longer qualify for the Program. (Third Klusaritz Declaration ¶ 31(f)).

FAS's submitted declarations point out that "over 98 percent" of agricultural trading takes place outside of the GSM-102 Program, and while these countries may not qualify for the program, "there would be ample opportunity for competitors to utilize their confidential information to develop non-GSM-102 trade transactions."  (*Id.* ¶¶ 22, 31(f)).  Simon Brotherton of Bunge states that "[t]he specialist knowledge . . . is effectively the same whether done applied to the GSM-102 program or to the wider commercial marketplace.  It is therefore irrelevant whether the GSM 102 [sic] guarantee program is currently available; Bunge may or may in the future use its specialist knowledge to compete for the same or similar business relying on the same parties and same or similar financial structures."  (July 2015 Brotherton Decl. ¶ 6).  The Nikkel Declaration also argues that disclosure "would not only harm Bunge in the GSM-102 program market but also in the wider commercial market because Bunge completes against the same companies in the commercial marketplace."  (May 2015 Nikkel Decl. ¶ 12).

Notably, however, nearly all of the submitters' discussion of harms relates specifically to the GSM-102 program, not to outside transactions.  (*See, e.g.*, Apr. 2015 Brotherton Decl. ¶¶ 10 ("high barriers to entry into the GSM-102 program"), 12 ( disclosure would allow competitors to "use Bunge's information as a playbook for how to structure, operate, and deliver a GSM-102 transaction"), 15 (Bunge employs over 100 employees "dedicated to establishing and maintaining the financing relationships necessary for the GSM-102 transactions"), 18 (Bunge

---

[7]  https://www.fas.usda.gov/sites/default/files/2014-11/fy_2014_-_final.pdf (FY 2014); Press Release, USDA-FAS, U.S. Sanctions on Russia Include Suspension of Export Credit (July 29, 2014), https://www.fas.usda.gov/newsroom/us-sanctions-russia-include-suspension-export-credit.

invested significant resources in "training its employees who work on the GSM-102 transactions in the unique program requirements . . . given the highly specialized nature of the structured financing involved in the GSM-102 program")).  Non-Program transactions are mentioned only in passing, almost as an afterthought.  (*See, e.g.*, Apr. 2015 Brotherton Decl. ¶ 20 ("Knowledge of Bunge's pricing would allow competitors to undermine and undercut Bunge's contracts both in the GSM-102 program and in other commercial markets.")).  More importantly, absent from these submissions is any declaration that the objecting submitters are actually engaged in non-Program transactions in Russia, Ukraine, or Kazakhstan with the same transaction partners.  The only mention of such activity is a vague contemplation that the submitters "may in the future" seek to engage in such transactions.  (July 2015 Brotherton Decl. ¶ 6).  In the court's view, given that the redacted information in these documents pertains only to transactions in these three countries, and the alleged harm is that hypothetical competitors could offer specific transactional partners better deals, then FAS must provide support for its argument that there will actually be competition in these markets and that competitive harm is likely.  Instead, FAS has only offered vague and conclusory allegations about potential competition in markets other than those relevant here.

Courts frequently hear that disclosure of information cannot cause substantial competitive harm because that information is "stale."  *See, e.g.*, *Biles*, F. Supp. 2d at 225–26; *Gov't Accountability Project v. FDA*, --- F. Supp. 3d ----, 2016 WL 4506967, at *15 (D.D.C. Aug. 26, 2016).  The D.C. Circuit recognizes that "stale information is of little value."  *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988).  However, some old information can still "retain[] its importance" in the present or in future years.  *Braintree Elec. Light Dep't v. U.S. Dep't of Energy*, 494 F. Supp. 287, 291 (D.D.C. 1980).  In Calderon's view, the redacted

information is not only stale, but in fact has no relevance or value to competitors because it concerns only transactions that occurred in Russia, Ukraine, or Kazakhstan, and these countries are no longer being used or no longer qualify for the Program.

The court agrees. While it might be true that the submitters *may* engage in non-Program transactions in Russia, Ukraine, or Kazakhstan, there is simply no evidence in the record that the submitters are presently engaged in any in these markets with these transactional partners, or even that non-Program competitors are engaged in such transactions to take advantage of the disclosed information. In short, there is simply no evidence that disclosure of this information "would *likely* cause substantial harm to the submitters' competitive position," as required by the statute. The court therefore finds that FAS has failed to satisfy its burden in applying Exemption 4 to this information. Therefore, the court will DENY FAS's motion and GRANT Calderon's motion as to the names and addresses of foreign banks in Russia, Ukraine, and Kazakhstan, since there are no banks in those countries that presently qualify for the program, and no evidence that the submitters continue to engage in transactions with those banks or face competition in doing so. The court will also DENY FAS's motion and GRANT Calderon's motion as to the names, addresses, and contact information for all importers, buyers, consignees, letters of credit parties/applicants, intervening purchasers, notify parties, or any other transaction parties in Russia and Ukraine, as these countries no longer qualify for the program, and similarly there is no evidence that the submitters continue to engage in transactions with these entities in these countries or face competition in doing so.

Because Kazakhstan remains qualified for the program, it is at least more plausible that the submitters may engage in Program transactions in that country and therefore disclosure of information relating to past transactions would likely harm the submitters. However, because the

24

Program has not guaranteed exports in Kazakhstan for several years, the court concludes that FAS has not satisfied its burden to establish that harm is likely, and there remains a genuine issue of material fact as to whether disclosure of the names, addresses, and contact information for all importers, buyers, consignees, letters of credit parties/applicants, intervening purchasers, notify parties, or any other transaction parties located in Kazakhstan would likely cause the submitters substantial competitive harm.  As a result, the court will DENY both Plaintiff's and Defendant's motions for summary judgment as to this information.

Calderon next argues that the information in the responsive bills of lading are not determined competitively, because these documents are either recycled or "rented" from other exporters in order to engage in the synthetic structured trade finance scheme described above. He also argues that the pricing information in both the commercial invoices and the program guarantee applications also are not competitively determined, but simply made up based on publicly available market quotes or from a "print" of another transaction.  (*See* PSMF ¶ 69).  As noted above, FAS does not dispute this fact, but only asserts that it is not material.  (*See* Def. Resp. to PSMF ¶ 69).  FAS further asserts that there is no way to know from the bills of lading, invoices, and applications whether such transactions were synthetic.  Bunge states that "there is nothing untoward about the letters of credit utilized by Bunge in the exemplar transaction[]," and that the "trade structured finance transactions [that it] entered into leverage Bunge's international trade flows to generate liquidity for customers and do not involved [sic] synthetics [sic] letters of credit."  (Dec. 2015 Brotherton Decl. ¶ 9).

The parties therefore offer differing descriptions of the program transactions and the competitive nature of the information underlying them, which, under other circumstances could create a genuine issue of material fact.  However, Calderon's factual assertions rely entirely on

his own declaration. (*See* PSMF ¶ 69 (citing Calderon Decl. ¶ 41)). While he states that he has "personal knowledge about the Program and how participants in the industry use the Program," (*id.* ¶ 1), the court cannot accept that Calderon has personal knowledge of the objecting submitters' transactions to which he was not a party. Though Bunge, at least, disputes that it engages in such transactions, it may be true that the submitters here engaged in the same types of synthetic transactional scheme that Calderon engaged in, and for which he was recently indicted and convicted. However, Calderon has not put forth sufficient or credible evidence to create a factual dispute on this issue. As a result, the court cannot conclude that information contained in the bills of lading, letters of credit, commercial invoices, guarantee applications, and other documents is not confidential simply due to the synthetic nature of the transactions.

Moreover, the court does not see the utility or added benefit of *in camera* review. While Calderon argued that the court could identify certain documents as synthetic based on dates, differing parties, and certain conditions in the letters of credit, FAS countered that "standard" transactions can appear similarly, such that even FAS personnel who work on the GSM-102 Program could not know whether the transactions were synthetic or not. The Court is not persuaded that it would be able to discern whether a document genuine or synthetic upon an *in camera* review.

Next, Calderon argues that some of the redacted information—namely the shippers, amounts, weights, and bank information—is already in the public domain, and therefore Exemption 4 cannot be applied to that information. *See CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987) ("To the extent that any data requested under FOIA are in the public domain, the submitter is unable to make any claim to confidentiality—a *sine qua non* of Exemption 4."). According to Calderon, because FAS disclosed the BL numbers on each bill of

lading in its production of documents, then the shippers, amounts, and weights can be reverse engineered using publicly available data in the PIERS database, which offers subscribers information obtained from U.S. Bureau of Customs and Border Protection about exports leaving the country.  (PSMF ¶ 103).  PIERS is a paid subscription service.[8]  The D.C. Circuit has held that "if the information is freely or cheaply available from other sources . . . it can hardly be called confidential."  *Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981); *Public Citizen v. HHS*, 66 F. Supp. 3d 196, 212 (D.D.C. 2014) (if "competitors can acquire the information only at considerable cost, agency disclosure may well benefit the competitors at the expense of the submitter," and in that case disclosure would be improper).  But Calderon offered no information as to the cost of the PIERS service, a necessary fact in determining whether the information "is freely or cheaply available from other sources."  In its June 10 Notice, FAS states that it "does not know" whether all of the bills of lading information is accessible on PIERS because "FAS, Credit Programs Division, does not subscribe to PIERS."  (ECF No. 51). Moreover, FAS argues that if Calderon is correct that the information can be cross-referenced and thus reverse engineered, "then there is no need for Plaintiff to seek the redacted information through the FOIA."  (*Id.*).

Calderon's Statement of Material Facts directs the court to Exhibit 30 to the Calderon Declaration, which contains six pages, including three bills of lading (two of which have information redacted) and what appear to be three PIERS printouts showing matching bills of lading numbers.  (*See* No. 41-5 at 248–54).  The PIERS printouts show the name and address of the shipper, the quantity, and the weight.  (*See id.*).  These printouts do not include other information on the bills of lading, such as the names of consignees, the names of notify parties,

---

[8]  *See* https://www.ihs.com/products/piers.html.

or the names of company officials. Calderon stated that "under exceptional circumstances and on a shipment-by-shipment basis [all] information [from BLs] may be withheld from disclosure," but offered no information as to whether this was the case for any of the responsive records at issue. (*See* Opp. at 34).

The court finds that Calderon has proffered enough evidence to establish an issue of fact as to whether the names and addresses of shippers, the quantities, and the weights of commodities are in fact in the public domain through the PIERS database. Therefore, the court will DENY FAS's motion as to these three pieces of information in the responsive documents. However, because Calderon provided the court with just two pairs of a redacted bill of lading and a PIERS printout, has not provided any information as to the price of a PIERS subscription, and has admitted that some the information from some exports is not recorded in PIERS, then the court cannot determine whether the names of shippers, quantities, and weights from all of the produced BLs are publicly available. Therefore, the court will also DENY Calderon's motion as to this information as there remains a genuine issue of material fact.

Calderon also states that foreign bank information may be found publicly through two methods. First, he notes that only approved foreign banks may be used in the Program, and the names and addresses of these approved banks are listed on the USDA website. Next, he argues that the foreign bank involved in each transaction was already effectively disclosed because FAS did not redact the LC Documentary Credit Numbers that correspond to each individual bank, and "each bank has a distinctive format for such numbers . . . [so] any competitor in structured trade finance who was active in those markets between 2004 and 2011 can readily recognize the identity of these defunct banks." (Pl. Rep. at 19). In its Notice, FAS responds only that it sought the advice of a U.S. bank that participates in the GSM-102 Program and was advised that "only

someone who routinely works with a particular foreign bank might recognize that the bank uses a particular methodology in assigning the documentary credit number." (Def. Not. at 3). FAS then chose to disclose these identifying numbers to Calderon, even though as a former Program competitor he was likely "someone who routinely works with [the] particular foreign bank[s]." Nevertheless, given that the court has already determined that the names and addresses of the foreign financial institutions involved in these transactions must be disclosed, it need not analyze disclosure based on Calderon's public domain argument.

Calderon also raises a general "bad faith" argument by pointing out that FAS has, in the past, not redacted the information it redacted here.[9] Plaintiff points to a spreadsheet containing "a list of bills of lading, commodities shipped, amounts and weight, and the identities of Actual Exporters and Consignees, used by participants across the entire Program" that FAS sent Brett Lillemoe upon request in January 2011. (*See* PSMF ¶ 102). FAS does not deny that it sent this spreadsheet, but responds that it did not contain information about the exporters involved in transactions, only the consignees, and as such did not reveal the confidential information in the context of actual transaction documents that Calderon currently seeks. (*See* Def. Rep. at 18). Calderon also points to past FOIA requests in which FAS purportedly did not redact the same information it redacted for him. (Opp. at 35–36). FAS responds that the information it provided the party there, HSBC, pertained to transactions to which HSBC was a part, and so the same competitive concerns did not exist. (Def. Rep. at 19). Ultimately, however, the court is not

---

[9] The court is concerned that FAS chose to disclose unredacted records to Calderon for submitters Grove Services, which did not object to disclosure, and Agritrade, which did not respond to FAS's outreach. To the extent that FAS relied on its own independent judgment, rather than the wishes of the submitters, in determining which information is confidential, it is certainly perplexing to the court why FAS would not have redacted the same information for Grove Services and Agritrade, despite the fact that they did not object to disclosure, given that the potential competitive harm from releasing this information should be identical.

convinced that it can glean anything from FAS's past actions or selective redaction in its document production that might impact its analysis regarding the redactions at issue in this case.

(iii).   Other Information

A.     Names and Contact Information of Employees and Officials

FAS argues that the names and contact information of the submitters' employees and officials should be redacted under Exemption 4 because competitors could reach out to these employees and poach them or could contact them seeking to find out information about their employers' transactions.  Though Calderon does not specifically rebut these arguments, the court is nonetheless unconvinced that releasing this information would likely cause substantial harm to the submitters' competitive position.  While the submitters may be concerned about competitors giving their employees more lucrative or attractive job offers, that is a routine aspect of competition, and is not the concern of FAS, FOIA, or this court, and therefore does not support redaction under Exemption 4.  Therefore, the court will DENY FAS's motion and GRANT Calderon's motion as to the application of Exemption 4 to names and contact information of the submitters' employees and officials.

B.     Bank Account and Tax Information

FAS redacted certain specific bank account numbers and tax ID numbers within the documents, arguing that disclosure may place the submitters at risk for fraud or theft.  The court agrees, and will GRANT FAS's motion and DENY Calderon's motion as to this information.

In sum, the court finds that Exemption 4 cannot apply to the following information: names and addresses of foreign banks in Russia, Kazakhstan, and Ukraine; names and addresses of all importers, buyers, consignees, letters of credit parties/applicants, intervening purchasers, notify parties, or any other transaction parties in Russia and Ukraine; names and contact

information for submitters' employees and officials.

The court finds that there remains a genuine issue of material fact as to the application of Exemption 4 to: names and addresses of all importers, buyers, consignees, letters of credit parties/applicants, intervening purchasers, notify parties, or any other transaction parties in Kazakhstan, due to the continuing question as to whether ongoing Program eligibility creates a substantial risk of harm; and names and addresses of shippers, and quantity, units, amounts, prices, and pricing mechanisms of commodities, as there remains a question as to whether this information is in the public domain through the PIERS database.

Finally, the court finds that Exemption 4 properly applies to the submitters' bank account information and tax ID information included on any of the responsive documents.

### C.    FOIA Exemption 6:  Personal Information

FAS invoked FOIA Exemption 6 to redact the names, signatures, business addresses, business telephone numbers, and business e-mail addresses of individuals in the responsive documents.  Exemption 6 protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Agencies (and courts) must engage in a four-step analysis to determine whether information is protected from disclosure under this exemption.  First, the text of the statute requires that the agency determine whether each document is a personnel, medical, or "similar" file.  Next, the agency must determine if the individuals identified in the documents have a significant privacy interest in the requested information.  *Multi Ag Media LLC v. USDA*, 515 F.3d 1224, 1229 (D.C. Cir. 2008).  Third, the agency must evaluate the strength of any potential public interest in disclosure.  *See NARA v. Favish*, 541 U.S. 157, 172 (2004).  Finally, the agency must balance the privacy interest with the public interest and determine whether

disclosure "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

The parties agree that the responsive records here are not personnel or medical records; they only dispute whether these are "similar files."  In this analysis, courts look "not to the nature of the files," but rather to "the nature of the information" at issue.  *N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1006 (D.C. Cir. 1990) (en banc) (quotation marks omitted).  If the court determines that the information "applies to a particular individual," then the threshold for applying Exemption 6 has been met, because the term "similar files" is to be interpreted broadly.  *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599–603 (1982); *see also Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 198–99 (D.C. Cir. 2006) (exemption 6 should be "read . . . to exempt not just files, but also bits of personal information, such as names and addresses") (quoting *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 391 (D.C. Cir. 1987)); *Skybridge Spectrum Found. v. FCC*, No. 10-1496, 2012 WL 336160, at *16 (D.D.C. Feb. 2, 2012) (exemption 6 can be applied to "the names and personal identifying information of officers, employees, and representatives of [competitors]").  Calderon cites *Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 256–57 (D.D.C. 2005), in which the court held that "the names and work telephone numbers" of government employees did not fall under the "similar files" category, finding that"[a] name and work telephone number is not personal or intimate information, such as a home address or a social security number, that normally would be considered protected information under FOIA Exemption 6."  However, this court concludes that the Supreme Court and D.C. Circuit precedent on this issue clearly encompasses the information here, which includes signatures and email addresses, and the information redacted by FAS is sufficiently similar to personnel or medical files to meet the threshold requirement for this

exemption.

The court must next identify whether there is a significant privacy interest and, if so, a countervailing public interest in disclosure.  FAS asserts that the "significant privacy interest" is as follows:  "Should these individuals' names and other contact information be disclosed, they would be subject to unwarranted contacts and solicitations about their knowledge about their respective employers or clients, or their participation in these sensitive commercial transactions." (Def. Mem. at 32–33).  The Supreme Court has made clear that "disclosure of a list of names and other identifying information" does not inherently violate individuals' privacy interest.  *Dep't of State v. Ray*, 502 U.S. 164, 176 n.12 (1991).  Plaintiff pushes further to argue that there can be no privacy interest in individuals' business information, a position that has found support in prior district court decisions.  *See Washington Post Co. v. USDA*, 943 F. Supp. 31, 33–35 (D.D.C. 1996) (no significant privacy interest in names and addresses because "cotton farmers can be expected to handle solicitations from farm machine manufacturers, fertilizer and seed companies").  Considering the statute's concern with "clearly unwarranted invasion of personal privacy," the court finds that there is no significant privacy interest in individuals' names or business addresses, but in light of FAS's and the submitters' harassment concerns, there is a privacy interest in the employees' business e-mail addresses and business phone numbers.

The privacy interest in non-disclosure of the e-mail addresses, signatures, and phone numbers must be weighed against the public interest in disclosure.  Though the court notes that Calderon fails to identify any specific public interest in disclosure of this information, "the only relevant interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'"  *Lepelletier v. FDIC*, 164 F.3d 37,

46 (D.C. Cir. 1999) (quoting *United States Dep't of Defense v. FLRA*, 510 U.S. 487, 497 (1994)).

Calderon asserts that the general purpose of his FOIA request is to reveal that "FAS has been

permitting—if not fostering—a practice that the U.S. Attorneys [sic] Office considers to be

criminal." (Pl. Opp. at 53). There is no logical connection between the e-mail addresses,

signatures, and phone numbers of employees at entities involved in these transactions and what

the government "is up to." As a result, the court concludes there is virtually no public interest in

disclosure of this information.

Having determined that there is no privacy interest in employees' names and business

addresses, the court GRANT Plaintiff's motion and DENIES FAS's motion with respect to

whether Exemption 6 permits these redactions. FAS is ORDERED to disclose individual names

and business addresses in the responsive documents. *See Nat'l Ass'n of Retired Fed. Emps. v.*

*Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989) ("If no significant privacy interest is implicated . . . ,

FOIA demands disclosure."). In light of the privacy interest employees have in non-disclosure

of their e-mail addresses or phone numbers, and the lack of a countervailing public interest, the

court DENIES Plaintiff's motion and GRANTS FAS's motion with respect to whether

Exemption 6 permits the redaction of e-mail addresses, signatures and phone numbers.

## IV.    CONCLUSION

For the foregoing reasons, FAS's motion for summary judgment is GRANTED IN PART

and DENIED IN PART, and Calderon's cross-motion for summary judgment is also GRANTED

IN PART and DENIED IN PART.

Date: February 21, 2017

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

34